[Civ. No. 39322. First Dist., Div. One. Jan. 24, 1978.]

MOUNT SUTRO DEFENSE COMMITTEE et al.,
Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Appellants.

**24**

**COUNSEL**

Garry, Dreyfus, McTernan, Brotsky, Herndon & Pesonen, and David E. Pesonen for Plaintiffs and Appellants.

Donald L. Reidhaar, David A. Dorinson, Gary Morrison, Howard, Prim, Rice, Nemerovski, Canady & Pollak, Stuart R. Pollak, Robert E. Gooding, Jr., Fred H. Altshuler and Steven L. Mayer for Defendants and Appellants.

**OPINION**

**RACANELLI, P. J.**—Defendants and appellants Regents of the University of California et al. (including certain named University officials individually and in their representative capacities)* appeal from the judgment below granting injunctive and declaratory relief in favor of plaintiffs and appellants Mount Sutro Defense Committee et al. (including certain named individuals and nonprofit associations and corporations).† Mount Sutro cross-appeals from a portion of the same judgment denying its application for attorney fees, and also appeals (denominated related appeal) from certain orders subsequently made vacating the injunction provisions of said judgment.

*The interests of these named parties are identical; for purposes of clarity and convenience they will be referred to throughout this opinion as either The University or University, except as contraindicated.

†For similar reasons, these parties will be referred to collectively as Mount Sutro.

*Procedural History*

Mount Sutro brought the underlying action against The University under the provisions of the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq., and the state EIR Guidelines, 14 California Administrative Code section 15000 et seq.,[1] seeking injunctive and declaratory relief (and attorney fees[2]), alleging that University's approval and certification of the final environmental impact reports (EIR) concerning proposed capital improvement projects to expand the school of dentistry and modernize the existing Moffitt Hospital situated on its San Francisco campus constituted an abuse of discretion within the meaning of section 21168.5[3] in that the regents had not proceeded in the manner required by law in approving such projects and in determining their environmental impact.

During trial the court considered extensive testimony and voluminous documentary exhibits concerning the planning and review process and procedures employed by The University in developing and finalizing its capital improvement projects and requests for funding by the Legislature. The adequacy of the final EIRs prepared by The University in relation to each project was not challenged and is not an issue on appeal. The court rendered an intended decision in favor of Mount Sutro and thereafter made extensive findings of fact and conclusions of law, the relevant portions of which are referred to in our discussion. Based upon such findings, the court entered its written judgment on December 16, 1975, (a) declaring that the written determinations required under section 21108[4] as made by The University president and regents

---

[1]Unless otherwise specified, all code section references are to the Public Resources Code and Guideline section references to title 14, California Administrative Code.

[2]Two additional causes of action challenging other projects were abandoned during trial.

[3]Section 21168.5 now provides as follows: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (The 1976 amendment added the word "finding" following "determination" in the first sentence.)

[4]Section 21108 provides in relevant part that "[w]henever a state agency . . . approves or determines to carry out a project which is subject to . . . [CEQA], it shall file notice of such approval or . . . determination with the Secretary of the Resources Agency. Such notice shall indicate . . . whether the project will, or will not, have a significant effect on the environment and . . . whether an [EIR] has been prepared . . . ."

concerning each project failed to comply with the applicable provisions of CEQA and constituted an abuse of discretion (1) in failing to include the final EIR as a part of the project planning guide (PPG) and as part of the existing review and budgetary process for each project, and (2) in the nonavailability of said EIRs to the Legislature at the time of its review of budget acts appropriating necessary funds for working drawings and construction; (b) enjoining The University from "taking any action in furtherance of the construction" of both projects.[5] The injunctive provisions were to remain effective until The University satisfactorily complied with the provisions of CEQA by undertaking an extensive rereview process[6] and, upon reconsideration and reapproval by the regents, transmittal of both PPGs and EIRs "to the Speaker of the Assembly and the President Pro Tem of the Senate of the California Legislature for whatever action the Legislature deems appropriate." The judgment further ordered that the certifications by the regents be set aside and the notices of determination filed pursuant to section 21108 be withdrawn; Mount Sutro's request for attorney fees was denied. The University appealed this judgment and Mount Sutro cross-appealed from the portion thereof denying attorney fees.

Upon completion of the rereview process and reapproval by the regents of the hospital project (Jan. 23, 1976) and dentistry project (Mar. 19, 1976), University moved to vacate the injunctive provisions of the judgment. Based upon uncontradicted and substantial evidence submitted by The University, the court determined that it had satisfactorily performed the mandated rereview process and rendered its order vacating the injunction as to the hospital project (Mar. 16, 1976) and subsequently the dentistry project (Apr. 9, 1976).

---

[5] The injunction provisions specifically mentioned a number of previously executed written service contracts within its prohibition.

[6] We summarize the substance of the conditions imposed to achieve such compliance with CEQA as follows: (1) a rereview and reconsideration of the existing PPG's and final EIRs by designated administrative officials of The University and submission of their collective recommendations to the chancellor of the San Francisco campus concerning continuance of the proposed projects or their alternatives; (2) upon the chancellor's recommendation, the PPGs and EIRs were to be transmitted to the systemwide administration with the request that the regents reconsider the current budget and program related to these particular improvement projects; (3) the reconsideration proposal, including the PPGs and EIRs, were to be reviewed and coordinated by the office of the vice president with designated administrative officials and planning and program review board; comments on the proposal were to be then transmitted to the office of budgetary planning; (4) a proposed action item for the regents was to be submitted to the president for his review and approval, and then forwarded to the regents for their approval or disapproval and reconsideration of their prior approval of the projects.

Findings of fact and conclusions of law in support of said order were made and filed (Apr. 28, 1976) and a decree vacating said injunction entered on the same day. Mount Sutro has appealed from the orders[7] of March 16, 1976, and April 9, 1976, vacating the injunctions.[8]

## Mootness

Preliminarily, we address the question of mootness of the appeal by The University in light of the decree vacating the injunctions.[9] Both sides agree that the issues presented should be decided on the merits in view of the broad public interest to be served by resolution of such issues. We are similarly persuaded. ■ "It is now established law that where, as in the cases at bench, issues on appeal affect the general public interest and the future rights of the parties, and there is reasonable probability that the same questions will again be litigated and appealed, an appellate court may, although the appeal be subject to dismissal, nevertheless adjudicate the issues involved. [Citations.]" (*People* v. *West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462, 468 [89 Cal.Rptr. 290]; see also *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 465 [125 Cal.Rptr. 129, 541 P.2d 881]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 470, pp. 4426-4427.)

The novel questions of statutory interpretation presented on appeal fall within the public interest exception to the mootness doctrine and are ripe for adjudication. Moreover, Mount Sutro's cross-appeal on its face

[7]Code of Civil Procedure section 904.1 authorizes an appeal ". . . (f) From an order . . . dissolving an injunction, . . ."

[8]Certain related proceedings should here be noted. In chronological sequence: (1) following the instant judgment of December 16, 1975, University filed a petition for mandamus with this court and an alternative writ issued. In the interim the court made its order vacating the injunctions thereby mooting the proceedings; the petition was accordingly denied in an unpublished opinion filed July 20, 1976 (1 Civ. 38165); (2) following the second judgment of April 28, 1976, Mount Sutro petitioned this court for a writ of supersedeas to reinstate the original judgment and to stay the projects authorized by the later judgment; this petition was denied on July 9, 1976 and by the Supreme Court on August 13, 1976 (*Mount Sutro* v. *Court of Appeal,* 1 Civ. 38165); (3) Mount Sutro renewed its petition for supersedeas herein which was denied by this court on June 20, 1977, and by the Supreme Court on July 20, 1977.

[9]The University has filed a motion requesting we take judicial notice pursuant to Evidence Code sections 452, subdivision (d), 455 and 459, of certain documents filed in a related action entitled *Inner Sunset Action Committee* v. *Matthews,* now pending in the federal Court of Appeals (Ninth Circuit); it is contended that these documents are relevant to the issue of mootness. Having reviewed certified copies of said documents, we are satisfied they are not of any substantial consequence in determining such issue or any other issue in the appeal. Accordingly, we deny the motion.

presents a viable issue for determination. Thus, we conclude it is entirely appropriate to adjudicate such issues.

## Statement of Facts

In order to fully understand the factual background against which the questions on appeal are presented, it is necessary to explain in some detail the various processes involved in the planning and funding of The University's capital improvement projects as interfaced with environmental requirements and considerations. In view of Mount Sutro's adoption of the statement of facts as set forth in The University's opening brief, we substantially adopt such statement of facts herein.

### I. *The Planning and Budgetary Process*

To secure necessary funding for capital improvement projects, The University as a state agency undertakes a complex and time-consuming process of planning and review directed towards eventual approval (or disapproval) by the regents for authority to request legislative appropriations.

Long-range physical planning for each University campus is conceptualized through the preparation of a long range development plan (LRDP). The San Francisco campus LRDP in effect at all relevant times herein was originally adopted by the regents in 1964 and amended periodically thereafter. In 1969, a multi-phase planning process to revise the LRDP was begun. In accordance with University policy, an EIR was prepared in conjunction with the proposed revision (the first such revision since the enactment of CEQA). Revision of the LRDP was still in the preparation stage as of September 1974.

The LRDP, used for planning purposes only, is intended to ensure that consideration is given to long-term trends and the relation of particular projects to the campus as a whole; inclusion of a particular proposed structure in the LRDP does not constitute a commitment by The University to proceed with that project. Physical planning for particular structures is preceded by programmatic planning—i.e., study and determination of academic needs and goals. Programmatic objectives are translated to specific proposed projects in a document entitled Project Planning Guide (PPG). The PPG is a document utilized at the *staff level only* to assess programmatic and financial feasibility of a

proposed major capital improvement project. It establishes the scope and purpose of the project and is intended to provide a foundation for subsequent planning. The PPG is often revised to reflect planning changes in the scope of the proposed project. It must be included in budget requests to the State Department of Finance but is not submitted to the regents and its approval by the campus chancellor does not constitute approval of the project or authorization to proceed beyond preliminary planning of the project.

The next stage of planning (following appointment of an architect) involves the preparation of preliminary plans and schematic drawings. The partial schematics prepared at the end of the preliminary design development stage must be presented for approval by the regents before the preparation of the more costly working drawings can begin. Following such approval by the regents and their concurrent review of the EIR (discussed *infra*), preparation of working drawings commences. This phase of planning extends over many months (as in the case of the Moffitt Hospital modernization, more than a year). Thereafter, the construction documents are prepared and made available to contractors, bids are received and reviewed, and construction contracts awarded.

Necessary funding is usually obtained in stages corresponding to the stages of planning and construction. In the case of a new capital project, the basic funding stages and time sequences are generally as follows:

First year—General program design
Second year—Preparation of preliminary plans and schematic design
Third year—Preparation of working drawings
Fourth year—Construction of improvements

The University president (with staff assistance) is responsible for the preparation, and submission to the regents, of an annual budget and capital improvement program. This function is initiated in March of each year for the budget to be enacted by the Legislature in June of the following year effective for that fiscal year. Briefly, this function entails the following steps: (1) in conformance with general guidelines outlined by the president, the chancellor of each campus submits a budget request for a proposed one-year operating budget and five-year capital outlay program; (2) the budget request is then reviewed by an academic planning and program review board, the office of budgetary planning and certain members of the president's staff (now termed systemwide

administration); (3) thereafter the president's proposed budget and improvement program is submitted to the regents in September; (4) following review and consideration by designated committees of the regents, the final proposed budget is submitted for approval by the regents during October; (5) upon approval by the regents, the adopted budget is forwarded to the State Department of Finance for inclusion in the Governor's proposed budget submitted to the Legislature for consideration and adoption during the next year's regular session.

Thus, it is apparent, the funding process involved in the design and construction of a major capital improvement program covers a period of years necessitating budget requests well in advance of actual appropriations and before the completion of earlier phases of work for which funds have been appropriated in prior years. The funding cycle is completed as requested funds are released for expenditure by the State Public Works Board upon its acceptance of project justification in accordance with the provisions of Government Code sections 15790 and 15792.[10] Requests for the release of funds to prepare working drawings must be supported by adequate preliminary drawings; requests for release of construction funds must in turn be supported by adequate working drawings. The University has no authority to undertake either preparation of the working drawings or any construction until after the board releases the requested funds; authority so obtained is limited to the particular phase of work for which funds have been released.

## II. *The EIR Procedures*

In accordance with section 21082[11] and the implementing state Guidelines adopted in early 1973, The University promptly developed its own procedures (set forth in relevant part in the margin)[12] designed to

---

[10]Section 15790 provides in pertinent part: "The board shall determine if construction, improvements, . . . shall be undertaken . . . ."

Section 15792 provides that upon such determination ". . . the Director of Finance . . . shall allot to the University of California the amount required to perform the work approved for the University . . . [such work] to be performed in the manner provided by law."

[11]Section 21082 generally requires each public agency to promulgate procedures to assure compliance with CEQA and its guidelines; section 15050 of the guidelines details minimum objectives, criteria and procedures to be set forth in such adopted implementing procedures in evaluating projects and in preparing environmental documents.

[12]The university procedures for implementation of the California Enviormental Quality Act of 1970, as amended February 15, 1974, states as its objectives the following:

ensure environmental considerations by the regents during its review of proposed projects and prior to their approval.

A review of The University's environmental procedures reveals a practice of beginning the environmental review process at the same time the PPG is prepared (see Guidelines, § 15086). The "initial study" recommended under then section 15080[13] of the Guidelines was initiated by completion of an environmental impact classification form requiring a determination whether the proposed project is subject (1) to an EIR requirement; (2) a negative declaration of significant environmental effect, or (3) categorical exemption. Upon completion of the PPG, preliminary planning is conducted in tandem with preparation of an EIR if (and as was) required by the classification form. While the amended

---

"II. OBJECTIVES

"The objectives of The Regents in approving these procedures are to ensure:

"A. That in the planning for each University project, environmental concerns are taken into account as early as possible and throughout the planning process.

"B. That each University project is evaluated as objectively as possible to determine the need for an EIR.

"C. That, if an EIR is required, it is in full compliance with the spirit and intent of the California Environmental Quality Act of 1970, as amended.

"D. That is, if an EIR is prepared, it will provide detailed information on the significant environmental consequences and if relevant, the social and economic consequences of the proposed project. The EIR shall examine the means for reducing any adverse environmental impacts of the proposed project to enable The Regents to decide if the project should proceed, be revised, or be abandoned, considering its objectives, its consequences and the alternatives available."

Included in section III(E) of the provisions of the amended procedures, which achieve these objectives, are the following:

"12. The Final EIR shall be reviewed by the President. If the President, in consultation with General Counsel, finds the Final EIR sufficient, the EIR will be recommended to The Regents for certification. The project may not proceed until the Final EIR has been certified by The Regents. This certification shall include the finding that the EIR has been completed in compliance with CEQA and the State guidelines.

"13. In their review, The Regents shall consider the contents of the Final EIR and make a decision to proceed with, revise, or abandon, the project on the basis of the objectives stated in these procedures. The Regents shall not certify a Final EIR for a project which involves adverse consequences to the environment if these consequences can be mitigated in a feasible manner or if feasible alternatives are available; it is recognized that while CEQA requires that overriding consideration be given to preventing environmental damage, The Regents may balance other public objectives in determining whether and how a project should be approved.

"14. The Regents may elect to send the Final EIR back to the President for resolution of elements of disagreement or dissatisfaction."

[13]We note that by amendment to this section filed in October 1976, it is now mandatory that such initial study be conducted and that "[a]ll phases of project planning, implementation, and operation must be considered" in such study.

procedures (§ III(E)(12), fn. 12 *ante*) did not specify the point beyond which the project could not proceed pending final EIR regents' certification, the record reflects a policy formulated by The University that the preparation of working drawings phase was not to be undertaken until its EIR procedures were fully performed (that policy was clarified by revision of its procedures in early 1975).

III. *Chronological Sequence of Events*

In 1964 the LRPD contemplated both the Moffitt Hospital and school of dentistry projects (the plan was amended in 1966 and 1969 to provide for construction of a separate school and its resiting). In October of 1963, 1964 and 1965 the regents requested and obtained funds for preliminary planning for the Moffitt Hospital project (appropriated in Budget Acts of 1964, 1965 and 1966, respectively). Similar funding requests were made for the school project in October of 1968 and 1969 (Budget Acts of 1969 and 1970, respectively). Working drawings funds were requested for the school project and appropriated in the 1970 and 1971 Budget Acts; partial construction funds were appropriated by the 1972 act. Working drawings funds for Moffitt Hospital were requested in October 1971 and appropriated by the 1972 act; construction funds were requested in October 1972 and appropriated by the 1973 act.

During 1972 and 1973 considerable community discussions took place concerning both projects as well as the LRDP process. Those public discussions figured prominently in the ultimate planning decisions to reduce the scope and modify the design of both projects. Additional working drawings funds for the reduced school project were included in the 1973 act. In January 1973, the current PPG for Moffitt Hospital was issued; the school's current PPG was issued in October 1973. Both included environmental classification forms indicating full EIRs would be necessary. Preliminary working plans and schematic drawings for both projects began in 1973. Work began on the draft EIRs in late 1973. Several public meetings (see Guidelines, § 15165) regarding the projects were held during the preparation of the EIR drafts and additional community views solicited informally. The regents' October 1973 budget request included working drawings funds and first phase construction funds for Moffitt Hospital; construction funds were also included for the school (1974 Budget Act).

The draft EIRs were completed in May 1974, and widely distributed. Formal hearings[14] to review the draft EIRs were thereafter held and full responses prepared to public comments received. Slides of the recently completed schematic drawings for the school were shown during the June hearing. The final EIRs were completed in September 1974 at a cost of approximately $150,000; following a review process by the regents' committee on grounds and buildings, the committee approved the president's recommendations to certify the reports and to authorize proceeding with the projects and voted to present these recommendations to the full board. At the meeting[15] of the regents on September 20, 1974, both EIRs were certified, and the respective projects authorized. On September 23, 1974, The University filed with the Secretary of Resources notices certifying that the final EIRs complied with CEQA and the Guidelines. No funds for the working drawings were released and no working drawings were begun for either project until after September 20, 1974, when the regents certified the EIRs and authorized the projects to proceed. As of that point, The University had expended on planning only 1.7 percent of the total funds budgeted for each of the two projects.

*Interpretation of Section 21105*

The central question presented herein revolves about considerations of timing under the requirements of section 21105.[16] The specific question raised is at what point in time must an EIR for a state-funded construction project be proposed? The University argues that no precise point in time is mandated under either the provisions of CEQA or its implementing Guidelines; rather, it is urged, the timing involved in the preparation of the required EIR is fundamentally a question of judgment reposed in the public agency to be determined in a manner consistent with the overall purpose and objectives of CEQA. The trial court, in

[14]The University developed special procedures for these hearings.

[15]Because this was the first meeting of the regents to consider an EIR, they were extensively briefed concerning their responsibilities under CEQA in certifying a final EIR.

[16]Section 21105 reads as follows: "The responsible state agency shall include the environmental impact report as a part of the regular project report used in the existing review and budgetary process. It shall be available to the Legislature. It shall also be available for inspection by the general public who may secure a copy thereof by paying for the actual cost of such a copy. It shall be filed by the responsible state agency with the appropriate local planning agency of any city, county, or city and county which will be affected by the project."

rejecting that argument, construed the section as mandating a precise time for preparation of the EIR, namely: in conjunction with preparation of the PPGs and *before* a request is submitted to the Legislature for Budget Act appropriations for working drawings or construction. None of the parties has cited, nor does our research disclose, an authoritative interpretation of this provision of CEQA which thus appears to be a matter of first impression.

In announcing its intended decision, the trial court properly emphasized the underlying purpose of CEQA to "attempt to influence the decision-making process of state agencies at a point where genuine flexibility remains before bureaucratic momentum strips the EIR of any real influence on decision-making . . . ." In accordance with the trial court's determination that the applicable standard of review was one of "strict compliance" with the statute, findings were made which in substance provided that the planning and budgetary process (described *supra*), including the preparation of PPGs therein, constituted "the existing review and budgetary process" within the meaning of the statute; and further, that the PPGs constituted the "regular project reports" used in such process. It thus reasoned that when the regents approved the funding requests submitted to the Legislature for working drawings and construction funds for the school and for Moffitt Hospital Phase I resulting in the appropriation of such funds in the Budget Acts of 1973 and 1974, the environmental impact report on each project had not been prepared and was not available to the Legislature during its consideration of such requests as required by section 21105, constituting a failure to comply with the procedural provisions of CEQA "within the meaning of section 21167, subdivision (c)."

We begin our analysis by reviewing familiar principles of statutory construction. ■ As summarized in *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110]: "One of the cardinal rules of construction requires that words be given such interpretation as will promote rather than defeat the *general purpose and policy* of the law. [Citation.] A statute should be interpreted so as to produce a result that is reasonable. [Citation.] [See also *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 673 (114 Cal.Rptr. 345, 522 P.2d 1345).] If two constructions are possible that which leads to the more reasonable result should be adopted. [Citation.] [See also *Metropolitan Water Dist.* v. *Adams* (1948) 32 Cal.2d 620, 630 (197 P.2d 543); *Committee of the Rights*

*of the Disabled* v. *Swoap* (1975) 48 Cal.App.3d 505, 510 [122 Cal.Rptr. 52].] [¶] ██ In construing a statute, the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] The courts must look to the context of the law, and where uncertainty exists, consideration should be given to the consequences that will flow from a particular interpretation. [Citation.]"

██ It is now well established that the provisions of CEQA are to be broadly interpreted in order to afford full protection of the environment. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 83 [118 Cal.Rptr. 34, 529 P.2d 66]; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049]; *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 590 [122 Cal.Rptr. 100].) In interpreting its provisions we rely upon federal precedents as helpful authority in construing parallel provisions contained in the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.) upon which the California act was modeled. (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 201 [132 Cal.Rptr. 377, 553 P.2d 537]; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 86, fn. 21; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 701 [104 Cal.Rptr. 197].)

Nowhere in CEQA and its implementing Guidelines is a precise time specified at which an EIR must be prepared during the project planning process. Rather, sensible recognition is given to competing considerations in accomplishing CEQA's objectives by favoring preparation of an EIR "as early in the planning process as possible to enable environmental considerations to influence project program or design . . . [and] before project plans are finalized" (Guidelines, § 15013)[17] but late enough in the project development to provide "detailed information about the [likely environmental] effect [and] ways in which [such] adverse effects . . . might be minimized; and to suggest alternatives . . . ." (Former § 21061; see also Guidelines, § 15012.)

[17]It should be noted that the 1976 amendments to Guidelines section 15013 (mandatory on Jan. 1, 1977) substantially modified it to now provide that "environmental documents" (defined by § 15026.5 to include "Draft and Final EIRs, Initial Studies, . . . Notices of Completion, and . . . Determination.") should be prepared "as early as feasible" (instead of as early as possible) for incorporation into the planning process. Additionally, new subdivision (c) provides that the "environmental document preparation and review should [defined as advisory under § 15015, subd. (b)] be coordinated in a timely fashion with the existing planning, review and project approval processes being used by each public agency. . . ." and, in cases of state agencies,

Recognizing a similar need to strike a balance between such competing concerns, the appeals court for the District of Columbia addressed the issue in the following manner: "In our view, the timing question can best be answered by reference to the underlying policies of NEPA in favor of meaningful, timely information on the effects of agency action. . . . Thus we are pulled in two directions. Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process. [¶] Determining when to draft an impact statement for a . . . program obviously requires a reconciliation of these competing concerns."[18] (*Scientists' Inst. for Pub. Info., Inc.* v. *Atomic Energy Com'n* (D.C.Cir. 1973) 481 F.2d 1079, 1093-1094.) (S.I.P.I.) ▮ The intendment of the act and relevant Guidelines clearly contemplates the question of timing of the preparation of an EIR as basically an administrative decision to be made by a public agency consistent with the overall objectives of CEQA. (See *Desert Environment Conservation Assn.* v. *Public Utilities Com.* (1973) 8 Cal.3d 739, 742 [106 Cal.Rptr. 31, 505 P.2d 223] [where the question of timing was initially presented although not reached in light of the enactment of § 21082].)

Given that a "major purpose of an EIR is to inform other government agencies, and the public generally, of the environmental impact of a

". . . shall be included as part of the regular project report . . . used in its existing review and budgetary process." (See also Guidelines, § 15086.) Section 21061.1 (added by Stats. 1976, ch. 1312, § 5.1, p. 5891) defines "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors."

These several provisions seem to strongly imply that the authority charged (the office of planning and research per § 21083) with development and implementation of the Guidelines had not previously construed CEQA (or the Guidelines) as imposing a specific time requirement, a construction normally entitled to great weight. (*Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1].) Moreover, current definitions of environmental documents suggest something less than a full EIR may initially be used as a part of the "regular project report."

[18]In an attempt to develop a standard to evaluate such competing considerations, the court in *S.I.P.I.* fashioned a four-factor "balancing test" emphasizing (1) commercial feasibility of the technological development; (2) availability of information on effects of proposal and its alternatives; (3) extent of irreversible commitments during progress of the proposal; and (4) extent of severity of the environmental effects. (*Scientists' Inst. for Pub. Info., Inc.* v. *Atomic Energy Com'n, supra,* 481 F.2d 1079, 1094; accord: *Sierra Club* v. *Morton* (D.C.Cir. 1975) 514 F.2d 856, 880 [revd. *sub nom., Kleppe* v. *Sierra Club,* 427 U.S. 390 (49 L.Ed.2d 576, 96 S.Ct. 2718)].) However, the vitality of the *S.I.P.I.* test was short-lived; in granting certiorari in *Morton,* the United States Supreme Court expressly

proposed project [citations]. . . ." (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 86) and to inform the decision-making agency of the full range of adverse environmental effects and alternative measures prior to its decision to approve or disapprove such project (former § 21061; Guidelines, §§ 15012, 15150), the underlying policy of the act to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decision" (§ 21001, subd. (d)), dictates that the "initial and primary responsibility for striking [the necessary] balance between competing concerns must rest with the [decision-making] agency itself, . . ." (*Scientists' Inst. for Pub. Info., Inc.* v. *Atomic Energy Com'n, supra,* 481 F.2d 1079, 1094; see also *Desert Environment Conservation Assn.* v. *Public Utilities Com., supra,* 8 Cal.3d 739, 742) and whose consideration cannot be merely a "post hoc rationalization" of a decision already made. (See *Cady* v. *Morton* (9th Cir. 1975) 527 F.2d 786, 794; cf. *Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402, 419 [28 L.Ed.2d 136, 155, 91 S.Ct. 814]; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d 695, 706.) Such significant determination may not be judicially nullified in the absence of a prejudicial abuse of discretion manifested by the agency's failure to proceed in the manner required by law. (§ 21168.5; see *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 88.) ▮ In reviewing whether the agency procedures followed fully comply with CEQA, the test to be applied is not one demanding of absolute perfection but whether an objective, good faith effort to so comply is demonstrated. (See *National Helium Corporation* v. *Morton* (10th Cir. 1973) 486 F.2d 995, 1001-1003 [cert. den., 416 U.S. 993 (40 L.Ed.2d 772, 94 S.Ct. 2405)]; *Environmental Def. F., Inc.* v. *Corps of Eng. of U.S. Army.* (5th Cir. 1974) 492 F.2d 1123, 1131; *Environmental Defense Fund* v. *Tennessee Valley Auth.* (6th Cir. 1974) 492 F.2d 466, 468, fn. 1 [adopting the "rule of reason" test]; see also *San Francisco Ecology Center* v. *City and County of San Francisco, supra,* 48 Cal.App.3d 584.)

That the timing of the EIR is in the first instance committed to the discretion and judgment of the agency finds further support in two recent holdings of our federal Supreme Court: In *Kleppe* v. *Sierra Club, supra,* 427 U.S. 390, the court likewise confronted the issue of timing (of the NEPA environmental statement) and the propriety of agency determination. In striking the *S.I.P.I.* formulated "balancing test" (see fn. 18 *ante*)

rejected the balancing test as being without statutory authority. (*Kleppe* v. *Sierra Club,* 427 U.S. 390, 405-406 [49 L.Ed.2d 576, 587-588, 96 S.Ct. 2718] (decided June 28, 1976).)

it was held (at p. 406 [49 L.Ed.2d at p. 588]): "A court has no authority to . . . determine a point during the germination process of a potential proposal at which an impact statement *should be prepared.* Such an assertion of judicial authority would leave the agencies uncertain as to their procedural duties . . . [and] would invite judicial involvement in the day-to-day decisionmaking process of the agencies, . . ." Further, (at pp. 405-406 [49 L.Ed.2d at p. 588]): " . . . under the first sentence of § 102(2)(C) the moment at which an agency must have a final statement ready 'is the time at which it makes a recommendation or report on a *proposal* for federal action.' (*Aberdeen & Rockfish R. Co.* v. *SCRAP,* 422 U.S. 289, 320 (1975) (*SCRAP II*) (emphasis in original)."

In *Aberdeen & Rockfish R. Co.* v. *SCRAP* (1975) 422 U.S. 289 [45 L.Ed.2d 191, 95 S.Ct. 2336] (*SCRAP II*), the timing issue was considered in relation to what constituted a proposal within the agency's review process. In interpreting statutory language closely paralleling that contained in section 21105, the court reasoned as follows: "NEPA provides that 'such statement . . . shall accompany *the proposal* through the existing agency review process' (emphasis added). This sentence does not, . . . affect the time when the 'statement' must be prepared. It simply says what must be done with the 'statement' once it is prepared—it must accompany the 'proposal.' . . . Under *this* sentence of the statute, the time at which the agency must prepare the final 'statement' is the *time at which it makes a recommendation or report* [italics added] on a *proposal* for federal action." (At p. 320 [45 L.Ed.2d at p. 215].)

In this case there can be little doubt that the critical point in time is reached when final project recommendations and budgetary requests are submitted to the Regents as the ultimate decision-making body which alone is empowered to approve (or disapprove) capital improvement programs of that nature. (Cal. Const., art. IX, § 9.) The record establishes that at that juncture but before any final action was undertaken, the regents fully considered and evaluated the final EIRs prior to their certification and in accordance with the objectives and procedures set forth in its adopted Guidelines (fn. 12 *ante*); and in the absence of a contrary showing, the administrative procedures followed in evaluating the reflected environmental concerns are accorded a presumption of regularity. (*Alford* v. *Pierno, supra,* 27 Cal.App.3d 682, 690-691; *Campbell* v. *Board of Dental Examiners* (1971) 17 Cal.App.3d 872, 875-876 [95 Cal.Rptr. 351].) In performing those responsibilities, The University acted in faithful compliance with the intent and purpose

of CEQA. (See *San Francisco Ecology Center* v. *City and County of San Francisco, supra,* 48 Cal.App.3d 584, 596.)

In examining the complex and extended planning and budgetary review process required of The University as a state agency seeking program approvals and legislative funding, it appears eminently reasonable that the environmental review process should be instituted and undertaken at the same time as the preliminary physical planning of the projects in order to ensure that environmental factors are considered early enough in the planning process to impact planning decisions yet late enough to provide meaningful information for environmental assessment (see generally *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247), an objective unlikely to be fulfilled by reading into the statute an absolute and inflexible time requirement. Here, admittedly adequate EIRs submitted for timely agency consideration were made possible as a result of the coordinated exchange and evaluation of information between project planners and environmental consultants. Moreover, public comments were actively solicited and considered during this formative stage of planning and review. Significant environmental factors were thus able to be identified and assessed early enough during the on-going planning process to meaningfully influence and effect changes in the proposed projects, e.g., reduction in projects' size, design changes, retention and sale of outdated building structures, a school "drop-off circle" to relieve traffic congestion et al. In such manner The University was able to gather and evaluate necessary environmental data to assure that a completed EIR would be available to the regents at the moment of final decision, while at the same time avoiding costly delay that would otherwise result by reason of the staged funding schedule.[19] At the time the regents were required to consider certification of the EIRs and to determine whether to approve the projects (see University amended procedures III-E-13, fn. 12 *ante*), less than 2 percent of the estimated costs had been expended in the planning process; contrary to the trial court's determination, submission of the EIRs at such appropriate stage did not constitute "an idle act" without room for discretionary response by the decision-maker to environmental considerations. A fair appraisal of the record convincingly refutes such contention and clearly establishes a bona fide compliance with CEQA.

---

[19]University correctly points out that if the requested and approved appropriations for working drawings and partial construction must first be preceded by a fully prepared EIR, then a minimum delay of one year would be encountered in the funding cycle for each project and before the next stage of work could begin.

■ We therefore hold that a proper construction of section 21105 does not fix a rigid time table for preparation of the required EIR but instead directs that such document be included "as a part of the regular project report" (in the existing review and budgetary process) ultimately submitted to the decision-maker for its consideration and action (see *Kleppe v. Sierra Club, supra,* 427 U.S. 390, and *Aberdeen & Rockfish R. Co. v. SCRAP (SCRAP II), supra,* 422 U.S. 289). We further conclude that in order to achieve the salutary objectives of CEQA the determination of the earliest feasible time to introduce and coordinate environmental considerations into the planning process is to be made initially by the agency itself, which decision must be respected in the absence of manifest abuse. (§ 21168.5; *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d 68, 88.) Nor, as contended by Mount Sutro, does such interpretation of section 21105 conflict with the provisions of section 21102.[20] Briefly, Mount Sutro contends that the latter section in harmony with the former must be read in such manner that any state agency request for funds must be accompanied by an EIR; that a close reading of the section reflects the Legislature's assumption that the agency seeking release of appropriated funds had already complied with CEQA by including the EIR in the regular project report used in the completed review process as specified by section 21105. The University, chorusing a similar need for harmony, argues that the language excepting "funds appropriated in the Budget Act" can only mean that funding requests for inclusion in Budget Act appropriations need not be accompanied by an EIR; that a reading of the two sections together evidences a legislative intent that section 21105 does not require preparation of an EIR before submitting such appropriation requests.

■ It is an equally recognized canon of construction that ". . . the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; see generally 45 Cal.Jur.2d pp. 625-626, and cases there collected.) Although awkward in

---

[20]Section 21102 provides in relevant part: "No state agency, board, or commission shall request funds, nor shall any state agency, board, or commission which authorizes expenditures of funds, other than funds appropriated in the Budget Act, authorize funds for expenditure for any project, other than a project involving only feasibility or planning studies for possible future actions which the agency, board, or commission has not approved, adopted or funded, which may have a significant effect on the environment unless such request or authorization is accompanied by an environmental impact report. . . ."

syntax, the substantive parts of section 21102 may be reasonably construed to require that an EIR accompany all funding requests or disbursements for agency projects involving environmental constraints with two exceptions: (1) funds appropriated in the Budget Act, and (2) previously unfunded projects involving feasibility or planning studies only. By expressly excluding funds appropriated in the Budget Act, no purpose is served by requiring an EIR to accompany funding requests *for inclusion* in the Budget Act; moreover, while requiring that an EIR be included in the regular project report, section 21105 mandates only that "[i]t shall be available to the Legislature." Certainly, had the Legislature intended to include funding requests for Budget Act appropriations as well, it could and would have employed suitable language in each section to clearly express that purpose. Moreover, had such meaning been intended, it is doubtful that the Legislature would have nevertheless authorized such requests through appropriations (as it did) without submission of the EIRs.

In reasoning that section 21102 does not require requests for funding in the Budget Act be accompanied by an EIR, we are aided by a consideration of other pertinent provisions of CEQA and the Guidelines. Section 21100 requires a state agency to prepare an EIR for each "project" proposed to be carried out as approved; section 21065 defines project to include "(a) Activities directly undertaken by any public agency." (See also Guidelines, § 15037, subd. (a)(1).) Unlike its federal counterpart (42 U.S.C. § 4332(2)(c)), section 21100 uses the narrower term "project" rather than the broader term "action"[21] and omits any reference to "proposals for legislation" and "recommendations or reports relating to legislation and appropriations" (NEPA interim guidelines, 35 Fed.Reg. 7390) in defining "project" under section 21065 (*supra*), distinctions the Legislature was aware of when CEQA was adopted. (See *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, 261.) Further, Guidelines section 15037, subdivision (a)(1) as originally promulgated specifically excluded "proposals for legislation to be enacted . . ." in defining "project," an exclusion further amplified by a subsequent amendment adding: "other than requests by state agencies for authorization or funding for projects *independently* from the Budget Act" (Guidelines, § 15037, subd. (b)(2); italics added); such contemporaneous administrative interpretation is entitled to great consideration by

[21]The facial inconsistency noted in *Friends of Mammoth, supra,* at page 262, footnote 5 (through use of the two words interchangeably), has since been eliminated by the 1976 amendments substituting "project" for "action." (See § 21100, subds. (a), (d), and (f).)

the courts engaged in construing a statute. (*Noroian* v. *Department of Administration* (1970) 11 Cal.App.3d 651, 655 [89 Cal.Rptr. 889] and cases there cited.)

Our analysis of the meaning of section 21102 finds further support in the language contained in the recent decision of *People* ex rel. *Dept. Pub. Wks.* v. *Bosio* (1975) 47 Cal.App.3d 495 [121 Cal.Rptr. 375], where, in construing the minimum requirement imposed under section 21102 determining the application of section 21100 to an "on-going project," the court stated (at p. 512): "The language of these two sections is unambiguous and mandatory. What they literally provide is that an EIR is required before any state agency proceeds 'to carry out' any environmentally significant project in respect of which either a request for or an authorization of funds is required after the effective date of CEQA. *The only exemption provided is for 'funds appropriated in the Budget Act,' . . .*" (Italics added.)

We thus conclude that neither section 21102 nor any other provision of CEQA and its Guidelines requires that a state agency such as The University support its request for funds to be appropriated in the Budget Act by simultaneous submission of a completed EIR.

There remains the related question whether, as contended by Mount Sutro, the PPGs constitute the regular project reports contemplated within section 21105 (*ante*). As an integral part of its argument regarding construction of section 21105, Mount Sutro contends that the major role of the PPGs in the review and budgetary process render them in effect the principal documents upon which project planning decisions were based and budgetary determinations reached leading to the "inescapable conclusion" they constituted the regular project reports mentioned and were required to include a prepared EIR "as a part [there]of" as specified by the statute. In contrast, The University argues that the sole function served by a PPG is as a preliminary planning and feasibility document utilized by staff personnel in the planning and review process and is never submitted to nor considered by the regents during the critical decision-making stage; that to construe it otherwise would result in costly and unnecessary preparation of EIRs[22] (see *Kleppe* v. *Sierra Club, supra,* 427 U.S. 390) and by reason of its early preparation would

---

[22]The evidence indicated that only one out of three PPGs ever result in an actual project.

tend to frustrate the very purpose of CEQA in failing to provide adequate data for environmental review.

Since a number of PPGs were prepared, revised and considered throughout the planning process, University argues that the trial court acted arbitrarily in making findings singling out the subject PPGs as the regular project reports within the meaning of section 21105 (findings Nos. 12, 13 and 15). While we entertain some doubt as to the validity of that determination,[23] we are bound under rudimentary principles on appeal to accept those factual findings where—as here—substantial evidence exists in support thereof. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].) However, such circumstance does not affect any of the conclusions we have reached which are otherwise dispositive of the issues presented. As discussed herein, adequate EIRs were timely prepared and submitted to the decision-making agency in compliance with CEQA and its Guidelines; the reports were regularly considered and duly certified by that agency in the course of review and approval of the projects, and became "available to the Legislature." In accordance with established practices and procedures, the PPGs in question—while not submitted to the regents—were included as a part of the budget materials transmitted to the State Department of Finance in conjunction with the approval requests for funding in the Budget Act; thus none of the funds so appropriated were released until after the regents had considered and approved the EIRs and schematic drawings in the final stage of the review process. Apart from serving as a vehicle intended to assure consideration of the EIRs during the planning and review process, we cannot say that any error in failing to include the subject PPGs (as regular project reports) throughout a review process otherwise in substantial compliance with CEQA constitutes an abuse of discretion within the meaning of section 21168.5. (See *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 88.)

### Conclusion

For all the reasons discussed, we conclude that in determining and certifying the final EIRs for the Moffitt Hospital and school of dentistry

[23]Indeed, there is considerable force in University's argument that under the comprehensive review and budgetary process employed, the single most important report is the culminating "Agenda Item" presenting the proposed project to the regents for their consideration and final decision.

projects, The University proceeded in compliance with the applicable provisions of CEQA and its Guidelines. The trial court erred in reaching a contrary determination and in granting injunctive relief by its judgment of December 16, 1975. Accordingly, we must reverse such judgment. Our decision renders it unnecessary to reach the merits of the issues presented in Mount Sutro's related appeal from the orders vacating the injunctions and said appeal is dismissed. The motion to take judicial notice is denied.

Judgment reversed. The University as prevailing party herein shall recover its costs on appeal.

Elkington, J., and Broussard, J.,* concurred.

A petition for a rehearing was denied February 23, 1978, and the petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied April 13, 1978. Newman, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.