Opinion
 

 WOODS, J.—
 

 Summary
 

 The Cities of Vernon and Compton
 
 [1]
 
 and others filed petitions for writ of mandate to challenge the certification of an environmental impact report as to a portion of the redevelopment plan of the City of Long Beach for the Long Beach Naval Station. The superior court ordered the writ issued on the ground that certification of the final environmental impact report (FEIR) was a “post hoc rationalization” of a prior approval of the project, but rejected Vernon’s challenge to the FEIR on the ground that it was inadequate as an informational document. On appeal, Vernon contends that the FEIR did not properly define the project, that it failed to provide a proper analysis with
 
 *682
 
 regard to rail traffic, and that it used the wrong baseline for its traffic analysis. We do not agree that the FEIR was a post hoc rationalization of a prior approval; we therefore reverse on that ground, and vacate the writ of mandate. We also reject Vernon’s contentions, and affirm that part of the judgment.
 

 Military Base Reuse Plans: Statutory Framework
 

 Before disposing of any surplus real property located at any military installation scheduled for closure, the Defense Base Closure and Realignment Act of 1990 (DBCRA) requires the Secretary of Defense to consult with the heads of the affected local governments for the purpose of considering any plan for the use of such property by the local community. (See Pub.L. No. 101-510 (Nov. 5, 1990) § 2905(b)(2)(D), 104 Stat. 1814 set forth as subsequently amended as Note foil. 10 U.S.C. § 2687.)
 
 [2]
 
 The affected local government may submit a redevelopment plan prepared by its redevelopment authority; and upon the determination by the Secretary of Defense and the Secretary of Housing and Urban Development that the plan meets the criteria set forth in the DBCRA, the surplus real property may be transferred to the local government. (Note foil. 10 U.S.C. § 2687, Pub.L. No. 101-510, § 2905(b)(7), subpar. (A) et seq.)
 

 After a redevelopment plan is determined to meet the statutory criteria, and before disposing of the surplus real property, the Secretary of Defense must prepare a decision document in accordance with the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.). (Note foll. 10 U.S.C. § 2687, Pub.L. No. 101-510, § 2905(b), subpars. (7)(K)(ii) and (7)(K)(iv)(III).) The National Environmental Policy Act (NEPA) requires any federal agency considering “major Federal actions significantly affecting the quality of the human environment” to prepare an environmental impact statement identifying the environmental consequences of the proposed action and recommending ways to minimize those which are adverse. (42 U.S.C. § 4332(2)(C).) For purposes of carrying out the required environmental assessment under the DBCRA, the local redevelopment plan is to be treated as part of the proposed federal action. (Note foll. 10 U.S.C. § 2687, Pub.L. No. 101-510, § 2905(b), subpar. (7)(K)(ii).)
 

 The California Environmental Quality Act (CEQA) provides that the federal environmental impact statement, prepared for the redevelopment plan (or reuse plan) pursuant to the DBCRA, may be used as a draft environmental impact report required under CEQA, upon compliance with specified conditions, including a notice and comment period. (Pub. Resources Code,
 
 *683
 
 § 21083.8.)
 
 [3]
 
 The determination of whether a proposed reuse plan will have a significant effect on the environment may be made as of the time of the final decision to close the base. (Pub. Resources Code, § 21083.8.1, subd. (b)(1).)
 

 Factual and Procedural Background
 

 In 1991, the Department of Defense announced that the Long Beach Naval Station would be among the military bases recommended for closure. In 1992, the Long Beach City Council authorized the formation of the Navy Properties Reuse Committee to develop a reuse plan under the auspices of the City’s economic development commission. During the planning process, the Navy decided not to close the adjacent shipyard, and to retain 70 of the 240 acres of station property for the shipyard’s use. The city council was recognized as the local reuse authority for the naval station redevelopment, and a reuse plan was submitted to the Department of Defense in 1993.
 

 The Federal Base Closure Community Redevelopment and Homeless Assistance Act of 1994
 
 [4]
 
 was enacted and requires reuse plans to consider the needs of the homeless. In February, 1995, the city council authorized the preparation of a second reuse plan to meet the requirements of the act.
 

 In June, 1995, the Federal Base Closure and Realignment Commission decided to close the naval shipyard on a “fast track” basis, which would free the 70 acres retained from the station property by July, 1996. The City therefore prepared a third reuse plan, including the 70 acres. The reuse plans called for a retail center, a multiservice center for the homeless, 176 units of housing and emergency shelters, a community college facility, a child development center, a university research and technology facility, a Job Corps center, a public middle and high school, and an expansion of the cargo handling facilities for the Port of Long Beach, the project at issue here. The final plan was approved by the city council on December 12, 1995.
 

 The Navy began its preparation of an environmental impact statement on October 25, 1995. On November 1, 1995, the Port of Long Beach began the preparation of a draft environmental impact report (DEIR) for the harbor
 
 *684
 
 expansion, the Pier T Marine Terminal project. The Board of Harbor Commissioners of the City of Long Beach, as lead agency, prepared a DEIR, completed it on May 28, 1996, and thereafter circulated it.
 

 On April 4, 1996, before the DEIR began circulating, the Port of Long Beach, by its executive director, entered into a “Statement of Intent and Terms for Proposed Container & Intermodal Terminal” with the China Ocean Shipping Company (COSCO), the national flag line of the People’s Republic of China.
 
 [5]
 
 The five-page statement expressed the parties’ intent to enter into a lease of a container storage facility to be developed on “Pier T in the former Naval Station (with possible expansion into the Supply Center or Shipyard):” It contained a description of the expected development and equipment to be installed, the right of COSCO to approve designs, the term of any lease, compensation, and other terms.
 

 On September 3, 1996, the board certified the FEIR and approved the project. The FEIR describes the Pier T Marine Terminal project as a marine container terminal on the site of the former naval station, featuring a newly constructed storage yard with cargo handling equipment, including 6 gantry cranes, berths for two 70,000-ton vessels, and storage capacity for approximately 7,800 grounded containers and approximately 850 truck-chassis-mounted containers. The project was expected to require dredging up to 5,000,000 cubic yards of sediment for the construction of a 2,500-foot-long wharf. Access would be provided by a newly constructed four-lane roadway and on-dock railyard with approximately fifteen acres of track. Five new buildings would be constructed for administration, maintenance, repair, and operations.
 

 The FEIR identified two alternatives: an intermodal railyard with similar facilities, but significantly less container storage capability; and a no project alternative which would place the naval station in “caretaker” status, and unavailable for public use.
 

 On November 4, 1996, two months after the FEIR was certified, the City entered into an agreement entitled, “Preferential Assignment Agreement,” with COSCO Terminals America, Inc., a California corporation. The 85-page agreement grants to COSCO “a nonexclusive preferential assignment of the wharf and contiguous wharf premises of the Designated Number of acres, as elected by [COSCO] . . . , together with the improvements
 
 *685
 
 thereon and such water area contiguous to the wharf as may be required for the berthing of vessels (the ‘Premises’) all as shown on Exhibit ‘A.’ ” The City agreed to make specified improvements, and COSCO agreed to a specific schedule of compensation. The improvements appear to be the same as those described in the FEIR.
 

 The “Designated Number” of acres is defined in the agreement as “the initial minimum size of the Premises” designated by COSCO, 110 acres. COSCO may increase the designation to 145.3 acres upon notice prior to the completion of the City’s improvements. The agreement recites that the City is actively seeking approval to reuse the naval shipyard, and gives COSCO an option for expansion into the shipyard property, provided the City’s reuse plan is approved, and an environmental impact report is certified for the shipyard.
 

 In the meantime, the City of Vernon, the City of Compton, and Long Beach Heritage, a nonprofit corporation which is not a party to this appeal, each filed separate petitions for writs of mandate. The Audubon Society, also not a party to this appeal, obtained leave to intervene in the petition filed by Long Beach Heritage. The three cases were consolidated upon stipulation of the parties. The matter went to trial on February 19, 1997, supported by 78 volumes of administrative record, and taken under submission.
 

 On February 27, 1997, the trial court ruled that the FEIR “adequately sets out the environmental impacts, feasible alternatives and mitigation measures and conclusions as to why some environmental impacts cannot be mitigated,” and that the FEIR’s findings were supported by substantial evidence. The court found, however, that the board of harbor commissioners did not properly evaluate the environmental impacts prior to approving the proposed project. The trial court was of the opinion that because the project was the board’s own idea, it was not free to reject it, whatever the result of the environmental analysis, and that approval of the project was a “foregone conclusion . . . throughout the CEQA process.” The court based its opinion on the reuse process, which required the City to propose a project and obtain its approval before the preparation of a draft environmental impact report. The court concluded, “This chronology rendered the CEQA process entirely superfluous, because the project had already been approved.”
 

 The trial court retained jurisdiction and remanded the matter to the board “to reconsider the project free and clear of any pre-committed [ric], preapproval or predisposition and with a complete evaluation of the EIR
 
 before
 
 deciding on the project.” (Italics in original.) The court did not explain by
 
 *686
 
 what means the board was to free itself of all prior commitments and approvals, or its predisposition.
 

 On remand, the board called a special meeting for the purpose of a public hearing on the impacts of the proposed Pier T Marine Terminal project, prior to the reconsideration of it. Long Beach Heritage suggested that a consideration of the project free and clear of all commitments required the rescission of the COSCO agreement, as well as all other agreements and permits relating to the terminal T project, including its agreement with the Navy and the reuse plan. Instead, the board suspended any pending project approvals, including its authorization to advertise for bids on two of the project’s construction projects, but it did not rescind the COSCO agreement, the reuse plan, any agreement with the Navy, or permits. After reciting that it had reviewed and considered the FEIR “free and clear of any pre-committed [szc], pre-approval or pre-disposition and with a complete evaluation of the FEIR before deciding on the project,” the board reapproved the project.
 

 The board then sought an order from the trial court that it had complied with its order of February 27, 1997. Its motion was supported by 13 additional volumes of administrative record regarding the public hearing, public comments, and the board’s resolution. The trial court found that the board “did not reconsider the project ‘free and clear’ of any pre-commitment, pre-approval, or pre-disposition because they did not vacate the COSCO lease which purportedly committed [the board] to, in effect, carry out the project.” On April 11, 1997, the trial court again retained jurisdiction and remanded the matter for the board “to reconsider the project free and clear of any pre-commitment, pre-approval, or pre-disposition and with a complete evaluation of the EIR
 
 before
 
 deciding on the project.” (Italics in original.) The court did not specifically address any commitment or approval other than the COSCO agreement.
 

 The board of harbor commissioners then rescinded the agreement with COSCO, and although it had not approved or ratified the earlier statement of intent, the board expressly disavowed it, as well. The board issued several new staff reports and held another special hearing, at which it heard public comment and a presentation by the harbor department staff. The board rejected a suggestion that it recommend that the city council reconsider the reuse plan, and one that the project be subjected to additional studies. It did, however, review the environmental impacts anew, and adopt supplemental mitigation measures, before approving the project once again.
 

 The trial court was not satisfied, and granted the petitions. Citing facts relating to the reuse process, the court found that since 1992, “the Board
 
 *687
 
 . . . was intimately involved in the advocating for [the] project . . . Because the board was a proponent of the project early on, the court concluded, it “did not feel free to disapprove” it. While recognizing that the COSCO statement of intent was not a legally binding commitment, the court found it to be a “significant example of pre-commitment, pre-approval, and/or pre-disposition, because it preceded the project by five months.”
 

 On September 2, 1997, judgment was entered in favor of the City on all causes of action except the second cause of action of the first amended petition of Long Beach Heritage. The court held that the FEIR was a “post hoc rationalization for the Board’s approval of the Project,” and on that ground, it ordered the issuance of the writ, commanding the board to set aside its resolution certifying the FEIR, and ordered that any further review of the project “be made without pre-commitment, pre-approval, or predisposition, as required by the California Environmental Quality Act.”
 

 The City of Long Beach filed its notice of appeal on September 4, 1997. The City of Vernon and the City of Compton filed a joint notice of cross-appeal on September 22, 1997, and Long Beach Heritage filed its notice of appeal on September 25, 1997. Upon the parties’ stipulation, we consolidated the appeals with one another and with those previously filed by Vernon, the City, the board of harbor commissioners, and the Port of Long Beach; and with the notice of appeal from an order for attorneys’ fees later filed by the City. The cross-appeal of Long Beach Heritage was later dismissed on that party’s motion.
 

 Discussion
 

 I.
 
 Standard of Review.
 

 The appellate court’s task, like that of the trial court, is to review the agency’s actions for an abuse of discretion. (Al
 
 Larson Boat Shop, Inc.
 
 v.
 
 Board of Harbor Commissioners
 
 (1993) 18 Cal.App.4th 729, 738 [22 Cal.Rptr.2d 618]; Pub. Resources Code, § 21168.5.) However, the trial court’s conclusions are not binding on us; we review the administrative record independently.
 
 (Gentry
 
 v.
 
 City of Murrieta
 
 (1995) 36 Cal.App.4th 1359, 1375-1376 [43 Cal.Rptr.2d 170].) An agency has abused its discretion if it has not complied with procedures required by law, or if its determination or decision is not supported by substantial evidence.
 
 (Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California
 
 (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) “As a result of this standard, ‘[t]he court does not pass upon the correctness of the EIR’s environmental conclusions, but only upon its sufficiency as an informative document.’ [Citation.],” and any reasonable doubts are resolved in favor of the administrative finding and decision.
 
 (Ibid.)
 

 
 *688
 
 II.
 
 The Appeal of the City of Long Beach.
 

 The trial court ordered the issuance of the writ on the ground that the FEIR was a post hoc rationalization for the approval of the Pier T Marine Terminal Project by the board of harbor commissioners. The court recognized that there had been no legally binding commitment to develop the project prior to certification of the FEIR, but concluded that because the board “did not feel free to disapprove” the project, it had, in effect, approved it. The court apparently used the word “approval” in the broad sense of esteem, rather than in the sense of an official act granting a permit or recognizing a right. If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it. In any event, the mental processes of local legislators and commissioners are irrelevant to the validity of their vote. (See
 
 City of Fairfield
 
 v.
 
 Superior Court
 
 (1975) 14 Cal.3d 768, 780 [122 Cal.Rptr. 543, 537 P.2d 375];
 
 City of Santa Cruz
 
 v.
 
 Superior Court
 
 (1995) 40 Cal.App.4th 1146, 1156 [48 Cal.Rptr.2d 216].)
 

 CEQA’s procedural requirements exist in part because of a presumed institutional bias.
 
 (Residents Ad Hoc Stadium Com.
 
 v.
 
 Board of Trustees
 
 (1979) 89 Cal.App.3d 274, 285 [152 Cal.Rptr. 585].) The CEQA Guidelines define “approve” not as a feeling, but as “the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person.” (Cal. Code Regs., tit. 14, § 15352, subd. (a).)
 
 [6]
 
 The agency commits to a definite course of action not simply by being a proponent or advocate of the project, but by agreeing to be legally bound to take that course of action. (Cf.
 
 No Oil, Inc.
 
 v.
 
 City of Los Angeles
 
 (1974) 13 Cal.3d 68, 76, 81 [118 Cal.Rptr. 34, 529 P.2d 66] [ordinances establishing oil drilling districts and permitting the drilling of two test wells];
 
 Citizens for Responsible Government
 
 v.
 
 City of Albany
 
 (1997) 56 Cal.App.4th 1199, 1213 [66 Cal.Rptr.2d 102] [submission of a fully negotiated development agreement under Government Code section 65865.2 to the voters];
 
 Save Our Skyline
 
 v.
 
 Board of Permit Appeals
 
 (1976) 60 Cal.App.3d 512, 521 [131 Cal.Rptr. 570] [final approval of a construction permit].)
 

 Vernon contends that the board became legally bound to develop the Pier T Marine Terminal project the moment the reuse plan was approved
 
 *689
 
 by the city council and the Department of Defense. Without citation to any authority other than “the procedures established by the DBCRA,” Vernon reasons that the reuse plan could not be changed, mitigation measures could not be taken, and alternatives could not be considered without an amendment to the reuse plan. Our review of DBCRA revealed no prohibition against changes in the plan if required to mitigate environmental impacts, and we do not agree with Vernon’s logic.
 
 [7]
 
 If, as Vernon claims, DBCRA requires an amendment of the reuse plan after environmental review, it is more analogous to the construction permit which was not “approved” because it was still subject to appeal in
 
 Save Our Skyline
 
 v.
 
 Board of Permit Appeals, supra,
 
 60 Cal.App.3d at page 521.
 

 In any event, CEQA
 
 anticipates
 
 the approval of a reuse plan
 
 before
 
 the preparation of a draft environmental impact report. Public Resources Code section 21083.8 permits the use of the federal environmental impact statement (EIS) as a DEIR under certain conditions. And the Secretary of Defense prepares the EIS
 
 after
 
 a reuse plan is approved. (See Note foll. 10 U.S.C. § 2687, Pub.L. No. 101-510, § 2905(b), subpars. (7)(K)(ii) and (7)(K)(iv)(III).) Thus the local agency is not required by CEQA to undertake environmental review before federal approval of a reuse plan.
 

 Although the trial court found that the statement of intent was not legally binding, Vernon contends that it was an entitlement which gave COSCO a vested right to the development of the project. Vernon compares it to the development agreement created pursuant to Government Code section 65865.2 in
 
 Citizens for Responsible Government
 
 v.
 
 City of Albany, supra,
 
 56 Cal.App.4th 1199, suggesting that the two agreements are similar. In fact, there is no similarity. Government Code section 65865.2 provides a procedure for obtaining a vested right to use property pursuant to a development agreement created under that section. In
 
 Citizens for Responsible Government,
 
 the Albany City Council adopted the development agreement by placing it on the ballot. (56 Cal.App.4th at pp. 1216-1217.) The port/COSCO statement of intent was not created under Government Code section 65865.2, and it was not adopted by the Long Beach City Council, or even by the board of harbor commissioners.
 

 The City contends that the executive director of the port did not have authority to enter into a binding contract under the terms contemplated by the statement of intent. Vernon contends that there is no substantial evidence of this lack of authority, and the parties devote much of their briefs to this
 
 *690
 
 issue. However, it makes little difference whether the executive director had such authority or did not have such authority. By its express terms, the statement of intent was not intended as a binding contract, and the parties do not contend that extrinsic evidence contradicts its express terms.
 

 Vernon points out that a letter of intent containing all essential terms may or may not constitute a binding contract, depending on the parties’ intent and their expectations. (See
 
 California Food Service Corp.
 
 v.
 
 Great American Ins. Co.
 
 (1982) 130 Cal.App.3d 892, 897 [182 Cal.Rptr. 67].) Vernon suggests that intent may be inferred from the terms of the statement of intent; however, an examination of the terms leaves no doubt as to the intent and expectations of the parties. In the very first paragraph, it states: “The parties intend this statement to reflect the basic understanding between them, but agree that the transactions contemplated herein shall be subject to the execution of mutually acceptable definitive and final agreements to be negotiated . . . [and] subject to the approval of the Board of Harbor Commissioners . . . and by [COSCO] .... This statement does not constitute a legally binding commitment.”
 

 COSCO could have no expectation of a binding contract. The statement of intent was just that and no more. Indeed, COSCO and the City did not enter into a binding agreement until after the certification of the FEIR, when the city council approved the “Preferential Assignment Agreement” on November 4, 1996, two months after the FEIR was certified.
 
 [8]
 

 The environmental review process should be undertaken early enough in the planning process to impact planning decisions, yet late enough to provide meaningful information for environmental assessment; but the timing of an EIR is committed to the discretion and judgment of the agency, whose decision must be respected in the absence of an abuse of discretion manifested by the agency’s failure to proceed in the manner required by law.
 
 (Mount Sutro Defense Committee
 
 v.
 
 Regents of University of California
 
 (1978) 77 Cal.App.3d 20, 37, 39-40 [143 Cal.Rptr. 365].) (2c) Since the City’s environmental review was undertaken after federal approval, as permitted under Public Resources Code section 21083.8, and since there was no prior approval as defined in section 15352, subdivision (a) of the Guidelines,
 
 *691
 
 the City did not fail to proceed in the manner required by law, and we find no abuse of discretion.
 
 [9]
 

 m.
 
 Vernon’s Cross-appeal.
 

 Vernon contends that the FEIR was inadequate as an informational document, because it did not properly define the project, because it failed to provide a proper analysis with regard to rail traffic, and because it used the wrong baseline for its traffic analysis.
 

 A.-C.
 
 *
 

 D.
 
 1990 was a permissible baseline.
 

 “[T]he determination of whether the reuse plan may have a significant effect on the environment may be made in the context of the physical conditions which were present at the time that the federal decision became final for the closure or realignment of the base . . . .” (Pub. Resources Code, § 21083.8.1, subd. (b)(1).)
 
 [14]
 
 Vernon contends that because the decision to close the base was not made until 1991, the baseline for determining existing physical conditions should have been 1991 or later. For the purpose of studying project impacts, the EIR used 1990, the last year of full operation closest in time to the closure decision, as its baseline.
 

 The parties have not found authority construing Public Resources Code section 21083.8.1, subdivision (b)(1), and our review has turned up none. We must therefore ascertain and effectuate legislative intent.
 
 (Kimmel
 
 v.
 
 Goland
 
 (1990) 51 Cal.3d 202, 208 [271 Cal.Rptr. 191, 793 P.2d 524].) “In determining intent, we look first to the language of the statute, giving effect to its ‘plain meaning.’ ”
 
 (Id.,
 
 at pp. 208-209.) “Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature.”
 
 (Burden
 
 v.
 
 Snowden
 
 (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)
 

 
 *692
 
 The words of the statute are unclear; it is unlikely that the Legislature intended the baseline to be a single day, the very day the closure decision became final. The ensuing analysis would be superficial and misleading. Vernon interprets the statute to require a baseline of on or after the final decision date. The City counters that a meaningful analysis requires the use of the last year a military base was fully operational.
 

 We have examined pertinent legislative committee analyses prepared during the legislative review and enactment process of Senate Bill No. 1180, 1995-1996 Regular Session, which became Statutes 1995, chapter 861, adding section 21083.8.1.
 
 [15]
 
 “[I]t is well established that reports of legislative committees and commissions are part of a statute’s legislative history and may be considered when the meaning of a statute is uncertain. [Citations.] . . . [I]t is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it.”
 
 (Hutnick v. United States Fidelity & Guaranty Co.
 
 (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236, 763 P.2d 1326].)
 

 The analyses are informative of the purpose of the closure date language in section 21083.8.1. For example, the analysis of Senate Bill No. 1180 (1995-1996 Reg. Sess.) by the Assembly Committee on Appropriations, dated September 12, 1995, states: “This bill . . . [a]mends the California Environmental Quality Act (CEQA) to allow the environmental review of a closed military base reuse plan to use the
 
 pre-existing
 
 conditions at a military base, at the time of base closure, as a ‘baseline’ for purposes of assessing whether or not there is a significant effect on the environment . . . .” (Italics added.)
 

 The analysis of Senate Bill No. 1180 (1995-1996 Reg. Sess.) by the Senate Rules Committee, dated September 28, 1995, states: “This bill would allow a lead agency responsible for the preparation and certification of a closed military base reuse plan to use the physical conditions present at the time the closure decision was made as a ‘baseline’ for consideration of the plan’s effects relative to that baseline so as to grandfather in existing conditions on the base. (This would not apply to soil or water toxic contamination.)”
 

 
 *693
 
 The analysis of Senate Bill No. 1180 (1995-1996 Reg. Sess.) by the Senate Committee on Governmental Organization, dated April 18, 1995, states: “Proponents state that this measure will expedite preparation of the EIR by allowing it to more fully adopt the federal EIS. Currently, the Army and Navy use
 
 pre-closure
 
 conditions as the baseline for evaluating impacts of reuse in the EIS that they prepare for closing bases . . . .”
 
 [16]
 
 (Italics added.)
 

 Thus, the materials available to the legislators who enacted Senate Bill No. 1180 informed them that the purpose of the bill was to provide a preclosure baseline. We found no comments to the contrary. We conclude that the Legislature intended the baseline period to be the period during which the base was fully operational, and that the date of the decision to close a base is a cutoff date, not a start date, as Vernon suggests. 1990 was therefore the appropriate baseline year.
 

 E., F.
 
 *
 

 Disposition
 

 The judgment is reversed insofar as it held that the FEIR was not certified in compliance with CEQA, because it was a “post hoc rationalization” for an approval of the project. Accordingly, we hold that the court erred in ordering the issuance of a peremptory writ of mandate, and the award of attorneys’ fees under Code of Civil Procedure section 1021.5 is therefore also reversed. The judgment is affirmed in all other respects. The peremptory writ of mandate is vacated, and the superior court is directed to enter a new and different judgment denying the writ petition. The City of Long Beach, the board of harbor commissioners, and the Port of Long Beach shall receive their costs on appeal.
 

 Lillie, P. J., and Johnson, J., concurred.
 

 On May 29, 1998, the opinion was modified to read as printed above.
 

 [1]
 

 Since all briefs in this appeal filed by the Cities of Vernon and Compton have been filed jointly, we will refer to them both simply as “Vernon” for convenience. We will refer to the Long Beach parties as “the City.”
 

 [2]
 

 The DBCRA (Pub.L. No. 101-510) as subseqently amended is found in the notes following 10 United States Code section 2687. (See 32 C.F.R. § 175.3(a) (1997).) Henceforth we will cite its provisions as Public Law No. 101-510, section 2905 et seq.
 

 [3]
 

 It was the intent of the Legislature when it enacted Public Resources Code section 21083.8, if there were sufficient federal funding available and a federal environmental impact statement had not yet been prepared, that the state or local lead agency make reasonable and feasible efforts to prepare the environmental impact report jointly with the preparation of the federal environmental impact statement; or if not feasible, to use the federal environmental impact statement as a draft environmental impact report. (Stats. 1994, ch. 842.)
 

 [4]
 

 See Note following 10 United States Code section 2687, Public Law No. 103-421, section 1, 108 Statute 4346.
 

 [5]
 

 Since then, in the National Defense Authorization Act of 1998, Congress has expressly prohibited any lease, sale, or other conveyance of any part of the Long Beach Naval Station to COSCO, subject to the waiver of the President, due to national security concerns. (See Pub.L. No. 105-85, § 2826, 111 Stat. 2001.)
 

 [6]
 

 All references to Guidelines are to the CEQA Guidelines, which implement the provisions of CEQA. (See Cal. Code Regs., tit. 14, § 15000 et seq.) “These Guidelines are binding on all public agencies in California.” (Guidelines, § 15000.) “[Cjourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.”
 
 (Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California, supra,
 
 47 Cal.3d at p. 391, fn. 2.)
 

 [7]
 

 We will disregard Vernon’s puzzling reliance on authority finding federal preemption of state regulation of late fees imposed by credit card issuers. (See
 
 Greenwood Trust Co.
 
 v.
 
 Com. of Mass.
 
 (1st Cir. 1992) 971 F.2d 818, 822.)
 

 [8]
 

 In a circuitous argument, unsupported by authority, Vernon contends that even this post-FEIR agreement was a “pre-commitment” because it was executed prior to the first reconsideration of the FEIR ordered by the trial court. Since we have already found that the trial court’s remands were based upon an erroneous interpretation of “approval,” we need not decide to what extent CEQA requires clairvoyance.
 

 [9]
 

 Because we find the City proceeded in the manner required by law, we do not reach the City’s remaining contentions.
 

 *
 

 See footnote,
 
 ante,
 
 page 677.
 

 [14]
 

 Subdivision (c) of section 21083.8.1 appears to condition the use of the date of the closure decision as a baseline upon the agency’s having followed specified procedures involving notice, hearing, and analysis. It reads; “Prior to preparing an environmental impact report for which a lead agency chooses to utilize the provisions of this section, the lead agency shall do all of the following . . . .” The procedures are then enumerated. Since Vernon does not contend that the City failed to follow them, we do not decide to what extent or whether failure to follow any of the procedures affects an agency’s ability to choose the date of closure as its baseline.
 

 [15]
 

 We notified the parties that we intended to rely upon the legislative analyses discussed above in relation to the baseline used for the EIR, and invited them to address this information. Vernon responded by arguing that the analyses supported a 1991 baseline. Ignoring the comments which we cite within, Vernon relies on the following comment in the Assembly Natural Resources Committee: “[This Bill] [authorizes the lead agency to determine if a base reuse plan may have a significant effect on the environment in the context of the physical conditions that existed at the time of the final decision to close or realign the facility . . . .”
 

 [16]
 

 Under NEPA, the appropriate baseline is the last year of full operation.
 
 (Conservation Law Foundation Inc.
 
 v.
 
 Busey
 
 (1st Cir. 1996) 79 F.3d 1250, 1266-1267.)
 

 *
 

 See footnote,
 
 ante,
 
 page 677.