[No. C050811. Third Dist. Jan. 2, 2007.]

CONCERNED McCLOUD CITIZENS, Plaintiff and Respondent, v.
McCLOUD COMMUNITY SERVICES DISTRICT et al., Defendants and
Appellants;
NESTLE WATERS NORTH AMERICA, INC., Real Party in Interest and
Appellant.

---

**COUNSEL**

Law Office of David McMurchie and David McMurchie for Defendants and Appellants.

Hatch & Parent, Lisabeth D. Rothman, Robert J. Saperstein, James E. Friedhofer, C. Wesley Strickland; and Diane C. DeFelice for Real Party in Interest and Appellant.

Nicholas J. Cammarota for California Building Industry Association as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Andrew R. Henderson for Building Industry Legal Defense Foundation as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Paul B. Campos for Home Builders Association of Northern California as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Cassidy, Shimko, Dawson & Kawakami, Anna C. Shimko and Matthew D. Francois for California Building Industry Association, California Business Properties Association, Building Industry Legal Defense Foundation and Home Builders Association of Northern California as Amici Curiae on behalf of Real Party in Interest and Appellant.

Law Offices of Donald B. Mooney and Donald B. Mooney for Plaintiff and Respondent.

**OPINION**

**CANTIL-SAKAUYE, J.**—This case concerns an agreement for a contingent proposal for the sale and purchase of spring water, between McCloud Community Services District (District) and Nestle Waters North America, Inc.

(Nestle). Concerned McCloud Citizens (Citizens), an unincorporated association formed for the purpose of protecting natural and cultural resources in the area of the town of McCloud in Siskiyou County, filed a petition for writ of mandate challenging the District's approval of the agreement with Nestle because the District failed to conduct any environmental review pursuant to the California Environmental Quality Act (CEQA)[1] prior to its approval of the agreement. The trial court concluded the District's approval of the agreement without prior CEQA review was a prejudicial abuse of discretion and entered a judgment granting the requested writ of mandate requiring the agreement to be vacated, set aside, and voided.

The District and Nestle appeal, primarily contending the District's execution of the agreement was not an "approval" of a "project" within the meaning of CEQA because the agreement was expressly conditioned on later CEQA compliance. The District and Nestle contend the District's administrative decision concerning the timing of environmental review should not be disturbed. In any event, the District and Nestle argue the trial court should not have set aside the entire agreement, but only those provisions having the potential to result in an adverse change or alteration of the environment. For the first time in their reply brief, the District and Nestle question whether Citizens has standing under section 21177 to challenge the District's actions. We conclude Citizens is not barred by section 21177 from bringing this action. We also conclude the District's approval and execution of the agreement with Nestle did not constitute approval of a project within the meaning of CEQA. Therefore, prior compliance with the CEQA review procedures was not required. We shall reverse the judgment of the trial court and direct entry of a judgment denying Citizens's petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

The town of McCloud is located within Siskiyou County on the southeast flank of Mt. Shasta. Historically, the economy of McCloud relied on the timber industry, but timber production declined in the 1980's. In the 1990's communities in the Mt. Shasta area began to seek alternate ways to generate economic prosperity, including selling mountain spring water to water bottlers.

---

[1] CEQA is codified at Public Resources Code section 21000 et seq. All statutory references are to the Public Resources Code unless otherwise indicated. The state CEQA Guidelines are set forth in title 14, section 15000 et seq., of the California Code of Regulations. All further citations to the regulations will be referred to as the Guidelines. "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA. [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I.*)

The District holds water rights to three springs from which it derives its water supplies: Intake Spring, Upper Elk Spring and Lower Elk Spring. The District has a total supply of approximately 14,500 acre feet of water per year. The town of McCloud uses approximately 1,600 acre feet of water per year. Like other communities in the area, the District considered developing a bottled water business. In 1991, in 1997, and again in 1998, the District negotiated, unsuccessfully, with various water bottling companies in an attempt to reach an agreement for this type of business. The District considered bottling and marketing the spring water itself, but a spring water bottling feasibility study conducted by the District in 2000 suggested it was better for the District to partner with an established water bottling company. The District continued to look for a water bottling company partner.

In 2002, the District completed a renovation of its water delivery system using revenues from the state water bonds approved by voters in the year 2000. Before this renovation, the District was losing a large percentage of its water supply from leaks and other damage to its aging redwood pipeline and other facilities. After renovation, it was calculated the District would have an additional available water supply of 1,364 acre feet a year.

In 2003, the District negotiated a tentative agreement with Nestle for the purchase and sale of up to 1,600 acre feet of water per year. On September 29, 2003, the District held a public meeting to consider the tentative agreement negotiated with Nestle. The general manager of the District and a representative of Nestle made a presentation to the public attending the meeting regarding the tentative agreement. Questions were then fielded from the audience for approximately 90 minutes. The board of directors of the District then approved the proposed agreement that is at issue in this case. The agreement was signed on October 1, 2003.

*The Agreement*

The initial term for the agreement is 50 years with a guaranteed right of renewal for another 50 years. Under the agreement a contingency period of not more than five years starts on the date of the agreement. During this contingency period, Nestle will evaluate the feasibility of the development and use of the District's springs as a spring water source and the siting, design and construction of a bottling facility. Assuming feasibility, Nestle will select a site for its bottling facility and will design such facility to be constructed, operated and owned by Nestle at its own cost, subject to government approvals and permitting requirements. Nestle will try to locate the bottling facility within the District's existing service area, but if its business needs require the facility to be located outside the existing service area, the District will do its best to annex the facility location. Nestle and the

District will together establish a plan and design for spring water testing, monitoring, collection and a distribution system as necessary to meet Nestle's standards and proposed uses. The District will design a new separate collection system, delivery system and such ancillary facilities as are necessary for providing spring water to Nestle to be owned by the District, but with Nestle paying the cost of such improvements. The design of such systems and facilities will not be final until approved in writing by both the District and Nestle. During the contingency period, the District and Nestle will jointly develop a water supply contingency plan to address foreseeable contingencies in the event of fires, drought, earthquake, other natural disasters and other emergencies. During the contingency period, Nestle and the District will jointly develop a road use plan to identify primary truck routes to be used by Nestle. The road use plan may be addressed as part of the CEQA process. Nestle may request the District to design, construct, and install groundwater wells on the bottling facility site for Nestle's use as a supply for non-spring water purposes. The wells will be owned by the District with all costs paid by Nestle. The contingency period will be used to apply for and secure all discretionary permits, defined as including CEQA documentation, review and approvals, along with the final adjudication of any legal challenges based on CEQA, and to assess environmental, title, physical, water quality and economic aspects of the project.

After the contingency period closes, Nestle's contractual right to commence purchasing and taking deliveries of water begins. Nestle has a right to interim sales of water for bulk delivery to its other bottling facilities, but the design and location of any necessary pipelines or loading facility for such interim sales must be approved by the District. Nestle must begin construction of a bottling facility within five years from the date of the agreement and must complete construction prior to the seventh anniversary.

Under the agreement the District agrees it will not enter into any discussions or negotiations with any other person or entity to purchase or use any spring water or to develop the District's springs. Nestle has the exclusive right to take delivery of and purchase spring water from the District. The agreement requires Nestle to make contingency fee payments to the District, exclusivity fee payments after the bottling facility is operational, and sets the price for the water supplied by the District. Nestle also agrees to establish and fund a community enhancement program for the community of McCloud. The agreement contains terms governing sewer and domestic water services to be provided to Nestle.

At any time during the contingency period, Nestle can cancel the agreement with or without cause. Nestle can terminate for cause after the bottling facility has been operational for 10 years, but cannot terminate because of its

development of other spring water sources to replace the District's water. The District can terminate for lack of payment by Nestle, bankruptcy of Nestle or prolonged delay in construction of the bottling facility.

Under "Article 9" "General Provisions," section 9.1 of the agreement provides as follows: "District and [Nestle] acknowledge and agree that the obligations of the parties under this Agreement are conditioned on District and [Nestle] completing, during the Contingency Period, proceedings under CEQA in connection with the Project, and the expiration of the applicable period for any challenge to the adequacy of District's and [Nestle's] compliance with CEQA without any challenge being filed. [Nestle] shall reimburse District for the reasonable costs of complying with CEQA, including administrative costs and the cost of litigation defense . . . . [Nestle] shall select a qualified environmental consultant acceptable to District to prepare the underlying documentation for District's review and consideration as may be required by CEQA and applicable law. [Nestle] shall direct the qualified environmental consultant and both [Nestle] and the environmental consultant shall coordinate the preparation of the environmental analysis with District to ensure a full, fair and complete consideration of potential environmental impacts. Any documentation submitted by [Nestle] shall be sufficient for District to make a fair decision in accordance with applicable law. . . . District and [Nestle] acknowledge that any modifications to the Load Station, the Collection System, the New Delivery System, the Ancillary Facilities or the Bottling Facility resulting from District's compliance with CEQA may necessitate amendments to this Agreement in a mutually acceptable manner. *Neither party shall be bound hereby unless and until District's compliance with CEQA is completed and there is no possibility of a challenge pursuant to CEQA.*" (Italics added.)

*Trial Court's Decision*

The trial court concluded this agreement constitutes an initial and integral stage of a project within the meaning of CEQA. The trial court concluded the approval of the agreement amounted to the creation of an entitlement for Nestle and committed the District to a definite course of action. According to the trial court, "[w]hen the agreement creates an option for the purchase of such a vital and environmentally sensitive community resource such as drinking water, with terms potentially extending out to 100 years, and the District is on the verge of divesting itself of any modicum of control over the compliance process, it is an abuse of discretion not to proceed with CEQA compliance prior to approval of the Agreement."

## DISCUSSION

### I.

### Section 21177 Does Not Bar This Action

We first dispose of a preliminary issue raised by the District and Nestle.[2] The District and Nestle contend Citizens lacks standing to challenge the District's action because it failed to comply with the requirements of section 21177, subdivision (b). We conclude such section does not bar Citizens's action in this case.

Section 21177, subdivision (b) provides: "No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing *during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination.*" (Italics added.)

The court in *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1210 [61 Cal.Rptr.2d 447], construed subdivision (a) of section 21177, which contains the same language we have italicized in subdivision (b). It concluded such language limited the application of section 21177 to the type of situations "where (1) CEQA provides a public comment period, or (2) there is a public hearing before a notice of determination is issued." (*Azusa Land, supra,* at p. 1210.) As the lead agency in *Azusa Land* had declared the project exempt from CEQA, "there was *no* 'public comment period provided by [CEQA]' and there was *no* 'public hearing . . . before the issuance of the notice of determination.' " (*Azusa Land, supra,* at p. 1210.) The court explained that "CEQA provides for public comment on a negative declaration and an EIR [environmental impact report] . . . CEQA does not provide for a public comment period before an agency decides a project is exempt. [¶] Similarly, where an agency approves a project and simultaneously decides that the project is exempt from CEQA, there is no 'public hearing . . . before the issuance of the notice of determination.' " (*Ibid.*) The court rejected the claim that a regularly scheduled meeting of the lead agency was a public hearing on the project at which the petitioners should have objected to the agency's action. Such meeting was not a public hearing before the issuance of the notice of determination. (*Id.* at pp. 1210–1211.) Therefore, petitioners were

---

[2] The District and Nestle raise this issue for the first time in their reply brief on appeal. We disapprove of waiting until a reply brief to bring an issue of possible jurisdictional significance to the court's attention. Such delay deprives the other party of the right to address the issue. To address this unfairness, we requested and have received a supplemental respondent's brief on the issue.

not precluded by section 21177 from challenging the exemption determination. (*Azusa Land, supra,* at pp. 1210–1211; accord, *Castaic Lake Water Agency v. City of Santa Clarita* (1995) 41 Cal.App.4th 1257, 1265 [49 Cal.Rptr.2d 79].)

For the same reasons we conclude section 21177, subdivision (b) does not apply to this case. The District meeting held on September 29, 2003, was not a public hearing before the issuance of a notice of determination. It was an informational meeting on the tentative agreement, the approval of which the District did not consider to be an approval of a project within the meaning of CEQA. Moreover, at the conclusion of the hearing the District did not issue a notice of determination. There is no public comment period under CEQA before an agency takes an action that it does not consider to be the approval of a project under CEQA. By its language, section 21177, subdivision (b), does not apply. Since we conclude it does not apply, we need not address Citizens's arguments of waiver, estoppel, lack of opportunity to object prior to approval, and exhaustion of its available limited administrative remedy.[3] Since we conclude section 21177 does not apply, we also need not consider whether the comments made by members of the public at the District meeting fairly raised an objection to approval of the agreement based on the lack of prior CEQA compliance. (See *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 282 [42 Cal.Rptr.3d 537].)

## II.

### CEQA Standard Of Review

Judicial review of an agency's compliance with CEQA where no administrative evidentiary hearing at the agency level was required is governed by section 21168.5, which limits judicial inquiry to whether there was a prejudicial abuse of discretion. (§ 21168.5; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74–75, fn. 3 [118 Cal.Rptr. 34, 529 P.2d 66] (*No Oil*).)[4] "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) We apply this same standard on appeal,

---

[3] Since we do not reach these issues, the declaration of Diane Lowe, filed by Citizens in support of its supplemental brief, is not necessary or material. On that basis we grant the District's and Nestle's motion to strike the declaration.

[4] Section 21168.5 is the CEQA standard of review for traditional mandamus actions. Section 21168 governs administrative mandamus proceedings. "The distinction between these two provisions 'is rarely significant. In either case, the issue before the . . . court is whether the agency abused its discretion.' " (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945 [91 Cal.Rptr.2d 66] (*County of Amador*).)

independently reviewing the administrative record of the agency's actions. The trial court's decision is not binding on us. (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1183 [31 Cal.Rptr.3d 901]; *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 687 [74 Cal.Rptr.2d 497] (*City of Vernon*).)

## III.

## Compliance with CEQA Was Not Required Before the District's Approval of This Agreement

■ "CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mt. Lion Found. v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280], quoting *Friends of Mammoth v. Bd. of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

■ CEQA generally applies "to discretionary projects proposed to be carried out or approved by public agencies . . . ." (§ 21080, subd. (a).) " 'CEQA requires that an agency determine whether a project may have a significant environmental impact, and thus whether an EIR is required, *before* it approves that project.' " (*Laurel Heights I, supra,* 47 Cal.3d at p. 394, quoting *No Oil, supra,* 13 Cal.3d at p. 79, original italics.) "A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding whether to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved. If postapproval environmental review were allowed, EIR's would likely become nothing more than post hoc rationalizations to support action already taken. We [the California Supreme Court] have expressly condemned this use of EIR's." (*Laurel Heights I, supra,* 47 Cal.3d at p. 394, italics omitted.) However, an agency has no duty of compliance with CEQA unless its actions will constitute (1) "approval" (2) of a "project." (*Lexington Hills Assn. v. State of California* (1988) 200 Cal.App.3d 415, 430 [246 Cal.Rptr. 97].)

■ The Guidelines define "approval" for public agency projects as "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a); see *Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 781–782 [1 Cal.Rptr.2d 107]

(*Stand Tall*); see Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2006) § 4.15, pp. 162–164.) With respect to private projects, "approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Guidelines, § 15352, subd. (b); see Kostka & Zischke, *supra*, § 4.14, pp. 161–162.)

■ "Project" "means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065; see *City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 537–540 [228 Cal.Rptr. 384, 230 Cal.Rptr. 867].) The Guidelines provide "project" means "the whole of an action" (Guidelines, § 15378, subd. (a)) and further that "[t]he term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).)

There is no disagreement among the parties, and we agree, the ultimate purchase and sale of spring water to Nestle by the District, involving the taking of a significant amount of water from the District's springs, trucking and/or piping the water to Nestle bottling facilities, constructing a new local bottling facility, potentially digging new groundwater wells, and the other related activities necessary to Nestle's bottling the District's spring water amounts to a project requiring CEQA compliance. The "whole of an action" "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Guidelines, § 15378, subd. (a); Pub. Resources Code, § 21065.)

We conclude, however, the District's approval of the agreement at the conclusion of the public hearing and the execution of the agreement with Nestle did not constitute "approval" of a project within the meaning of CEQA. The agreement at issue, when read as a whole and in light of section 9.1 (expressly providing the parties will not be bound by the agreement until compliance with CEQA is completed and there is no possibility of a CEQA challenge), does not commit the District to a definite course of action in regard to a project (Guidelines, § 15352, subd. (a)) nor does it amount to a

commitment to issue or the issuance of a contract or other entitlement for use of a project. (Guidelines, § 15352, subd. (b).) The agreement, while admittedly a binding contract, is conditional (see Civ. Code, §§ 1434, 1439) and does not grant Nestle a vested right of use of the project. The agreement is predicated on a series of "ifs" and commits the District to sell water to Nestle under the described terms only if the described terms are successfully completed. The "ifs" or contingencies contained in the agreement include but are not limited to: *if* Nestle determines during the contingency period water bottling from the District's springs is feasible and desirable, *if* Nestle selects a site for and designs a bottling facility *and* obtains all applicable government approvals and permits for the site and facility, *if* the District approves a design for water testing, monitoring, collection and distribution, including written approval of a new collection system, delivery system, and as yet unspecified necessary ancillary facilities, *if* the District and Nestle are able to develop a water supply contingency plan to address foreseeable emergencies, and *if* the District and Nestle are able to jointly develop a road use plan. The biggest "if" in the agreement however is *if* all discretionary permits, expressly defined as including CEQA documentation, review and approvals, along with the final adjudication of any legal challenges based on CEQA, are secured and all environmental, title, physical, water quality and economic aspects of the project are assessed.[5]

Contrary to the trial court's interpretation of this agreement as placing the District on the verge of divesting itself of any modicum of control over the compliance process, the terms of the agreement demonstrate the District retains the right to participate in and approve or disapprove of or modify major aspects of the prospective project.[6] Moreover, section 9.1 of the agreement expressly recognizes the ultimate water bottling project is subject to CEQA, will be reviewed pursuant to CEQA, and the agreement may be modified as a result. The District has not limited its discretion in conducting its part of such review. Indeed, the agreement nowhere precludes consideration by the District of a "no project" alternative. (See Guidelines, § 15126.6, subd. (e).) We view the agreement as temporarily holding in place a set of

[5] Citizens points to the provisions in the agreement limiting the District's ability to terminate the agreement to argue the District has committed itself to a definite course of action. Citizens's argument ignores section 9.1 of the agreement that expressly provides the parties are not bound by the agreement "unless and until" the District's compliance with CEQA is complete and final.

[6] Citizens claims "the District has no further discretionary decisions [to make] with respect to the agreement and the project as a whole." Citizens cites us to comments made by the attorney for the District and Nestle at the hearing on Citizen's petition for writ of mandate. To the extent counsel's comments can be understood as claimed by Citizens, the comments contradict the express written terms of the agreement. The terms of the agreement provide for a number of further discretionary decisions to be made by the District. It is the terms of the agreement that control, not counsel's ambiguous comments during argument.

preagreed financial terms between the parties, while conceptually outlining a proposal for a project to be subjected to and conditioned upon full environmental review. In exchange for the District's forbearance from negotiating with any other water bottler while such CEQA review takes place and other governmental permits and approvals are sought, Nestle has agreed to make certain contingency fee payments and to shoulder the costs of, among other things, CEQA compliance. Clearly the District is favorably disposed to the ultimate success of this project, but the agreement does not preclude it from considering a full range of options depending on subsequent CEQA review.

In *City of Vernon, supra*, 63 Cal.App.4th 677, the Port of Long Beach entered into a "statement of intent" with a shipping company expressing the parties' intent to enter into a lease of a container storage facility to be developed in a former naval shipyard. The agreement contained a description of the expected development and equipment to be installed, the right of the shipping company to approve designs, the term of any lease, compensation, and other terms. (*Id.* at p. 684.) Although it was clear the port was a proponent of the proposal, the Court of Appeal rejected the claim that the agreement amounted to an "approval" of a project under CEQA. "If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed toward it." (63 Cal.App.4th at p. 688.) "The CEQA Guidelines define 'approve' not as a feeling, but as 'the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person.' ([Guidelines], § 15352, subd. (a).) The agency commits to a definite course of action not simply by being a proponent or advocate of the project, but by agreeing to be legally bound to take that course of action. [Citations.]" (*Id.* at p. 688, fn. omitted.) Concluding the statement of intent did not bind the port, the Court of Appeal held the agreement did not constitute "approval" for purposes of CEQA. (63 Cal.App.4th at pp. 689–691.)

Here, too, the District is obviously in favor of a water bottling partnership with Nestle, but it has not legally bound itself to that project. The agreement here is not an "approval" of a "project." (Guidelines, §§ 15352, 15378, subd. (c).)

We find a previous case of this court, *Stand Tall, supra*, 235 Cal.App.3d 772, to be analogous. In *Stand Tall* a school district board of trustees passed two resolutions selecting a single preferred site for a new high school and authorizing its administration to make a formal offer to purchase the property for the new school. The offer was to be made contingent upon completion of the EIR process and final state approval. (*Id.* at pp. 776–777.) We concluded

the "resolutions regarding the site selection do not constitute an 'approval' under CEQA because they do not commit the District to a *definite course* of action since they are expressly made contingent on CEQA compliance." (*Id.* at p. 781, original italics.) We also found a contingent site selection expressly conditioned upon CEQA compliance did not meet the definition of a "project" under CEQA. (*Stand Tall, supra*, 235 Cal.App.3d at pp. 781–782.) Similarly here the agreement is a preliminary proposal expressly contingent on CEQA compliance. It is not the approval of a project under CEQA. (See also *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 474–476 [11 Cal.Rptr.2d 792] (*Kaufman & Broad*); *Citizens to Enforce CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594, 1600–1601 [33 Cal.Rptr.3d 208]; *County of Amador, supra*, 76 Cal.App.4th at pp. 964–965.)

This case contrasts with *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199 [66 Cal.Rptr.2d 102]. In *City of Albany* the city council negotiated a development agreement, pursuant to Government Code section 65864 et seq., allowing a developer to add a card room gaming facility to its existing horse-racing track operation. (56 Cal.App.4th at pp. 1205–1206.) The city council then passed several resolutions ordering the development agreement, accompanying zoning amendment, gaming ordinance and authorization of gaming within the City be placed on the ballot as "Measure F" for the general election. (*Id.* at p. 1206.) The voters passed Measure F by a narrow margin and a legal challenge followed, in part based on CEQA. (56 Cal.App.4th at p. 1206.) The city council took the position its decision to place Measure F on the ballot was exempt from CEQA requirements. (56 Cal.App.4th at p. 1207.) As to the zoning amendment, the Court of Appeal agreed (*id.* at pp. 1211–1213), but disagreed with respect to the development agreement. (*Id.* at pp. 1213–1215.) Since the development agreement gave the developer a vested right to complete its gaming facility within certain clear and narrowly defined parameters, the Court of Appeal concluded the agreement qualified as a project subject to the provisions of CEQA. (56 Cal.App.4th at p. 1215.) CEQA review was required before the city submitted the agreement to the voters because the city had, by voting to place the agreement on the ballot, approved the agreement within the meaning of CEQA, that is, the city had committed itself to a definite course of action, subject only to the outcome of the election. (56 Cal.App.4th at pp. 1216–1219.) The Court of Appeal rejected the city's argument that prior CEQA review was not required because the agreement contained terms contemplating subsequent environmental review and the incorporation of " 'reasonably' feasible mitigation measures." (56 Cal.App.4th at pp. 1219–1220.) First, the agreement's procedures and standards for analyzing and identifying impacts and mitigation measures were inconsistent with CEQA, which requires analysis of environmental concerns before

approval of a project. (56 Cal.App.4th at pp. 1219–1221.) Second, by entering into the agreement, the city had contracted away its authority to consider a full range of mitigation measures. (*Id.* at pp. 1221–1222.) Finally, the development agreement precluded consideration of the " 'no project' " alternative, contrary to the requirement of CEQA. (56 Cal.App.4th at pp. 1222–1223.)

■ The agreement between the District and Nestle, however, did not give Nestle any vested rights, did not legally commit the District to a definite course of action, and did not restrict the District's discretion to consider any and all mitigation measures, including the "no project" alternative.

■ The District's decision to enter into this contingent contract with Nestle was a reasonable exercise of the District's discretion as to the timing of CEQA compliance. Our comments in *Stand Tall, supra,* 235 Cal.App.3d 772, bear repeating. "As for the issue of when to prepare an EIR, it has been said that '[t]he timing of an environmental study can present a delicate problem.' [Citation.] '[T]he question of timing of the preparation of an EIR [is] basically an administrative decision to be made by a public agency consistent with the overall objectives of CEQA.' [Citation.] '[I]n order to achieve the salutary objectives of CEQA the determination of the earliest feasible time to [prepare an EIR] is to be made initially by the agency itself, which decision must be respected in the absence of manifest abuse. [Citations.]' [Citation.] Such an abuse is shown if the agency fails to proceed in a manner required by law. [Citation.] [¶] These principles regarding alternatives and timing must be considered in light of the fundamental purpose of CEQA, which is to ensure 'that environmental considerations play a significant role in governmental decision-making.' [Citations.]" (*Stand Tall, supra,* 235 Cal.App.3d at p. 780; see *Mount Sutro Defense Committee v. Regents of University of California* (1978) 77 Cal.App.3d 20, 36–37 [143 Cal.Rptr. 365].)

The Guidelines state that "[c]hoosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Guidelines, § 15004, subd. (b); see *Laurel Heights I, supra,* 47 Cal.3d at p.395.) "To implement [these] principles, public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance." (Guidelines, § 15004, subd. (b)(2); see *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 797–798 [187 Cal.Rptr. 398, 654 P.2d 168]

(*Fullerton*) [delay of CEQA review is inappropriate where as a practical matter it precludes alternative of continuing status quo].)

Here the District entered into a contingent agreement regarding a proposed project. The outline concepts of the project are set, subject to further CEQA and other relevant reviews, but the description of the physical location and specifications of the proposed project lack any certainty or definition. The agreement does not even specify the District spring or springs from which Nestle will take water for the proposed bottling facility. The agreement does not identify where the bottling facility will be located or any of the design specifications for the facility. The agreement anticipates there will be new separate collection and distribution systems, but does not give any location or specifications. It has not been determined if a loading facility or pipelines will be necessary for the interim sale of water. Assuming these will be necessary, there is no location or specifications provided. It has not been determined whether any trucking of spring water will be necessary and if so, how much, for how long, on what roads. No water supply contingency plan or road use plan has been drafted. It is uncertain whether any groundwell(s) will be included in the plan. At the current planning stage of this proposed project, preparation of an EIR would be premature. Any analysis of potential environmental impacts would be wholly speculative and essentially meaningless. (*Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556, 575–576 [80 Cal.Rptr.2d 294]; *Kaufman & Broad, supra*, 9 Cal.App.4th at p. 476 [environmental review would be meaningless if there is not specific information about the various courses of action available to agency]; *Stand Tall, supra*, 235 Cal.App.3d at p. 782 [CEQA review premature where EIR may yield little of value due to a lack of or unclear focus].) The contingent agreement does not commit the District to actions that "would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance." (Guidelines, § 15004, subd. (b)(2).) The delay in CEQA review does not preclude the alternative of continuing the status quo. (*Fullerton, supra*, 32 Cal.3d at pp. 797–798.)

We conclude the trial court erred in concluding the District prejudicially abused its discretion in approving and executing the agreement with Nestle. The District's actions did not constitute approval of a project within the meaning of CEQA. Therefore, subsequent compliance with the CEQA review procedures is permissible. Given this conclusion, we need not reach the issue of whether the trial court should only have set aside a portion of the agreement instead of the entire agreement. The trial court should not have set aside any of the agreement.

## DISPOSITION

The judgment granting Citizens's petition for writ of mandate and requiring the agreement between the District and Nestle to be vacated, set aside, and voided is reversed. The matter is remanded to the trial court with directions to enter a new judgment denying Citizens's petition for writ of mandate. Costs on appeal are awarded to appellants. (Cal. Rules of Court, rule 8.276.)

Scotland, P. J., and Sims, J., concurred.

A petition for a rehearing was denied February 22, 2007, and respondent's petition for review by the Supreme Court was denied April 25, 2007, S149941.